United States District Court
Southern District of Texas
**ENTERED**
August 08, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Enjet, LLC, § § § *Plaintiff,* § v. § Case No. 4:21-cv-03048 § Chevron, U.S.A., Inc., and § Blessey Marine Service, Inc., § § *Defendants.* § § | |

## MEMORANDUM AND RECOMMENDATION

There are two motions pending in this maritime suit. The first, filed by Defendant Chevron U.S.A, Inc. is a motion to dismiss under Rule 12(b)(6). Dkt. 13. The second, filed by Plaintiff Enjet, Inc. is a motion for leave to amend its initial complaint. Dkt. 18 at 7. Both motions are intertwined because leave to amend is unwarranted if Enjet's proposed amendments would be futile, which, in turn, requires determining if its claims as amended would survive dismissal.

The Court concludes that Enjet is entitled to amend its complaint— though only in part. Enjet's claim for negligent misrepresentation, as amended, adequately states a basis for recovery. Accordingly, the Court grants Enjet's motion for leave to amend with respect to that claim. But because Enjet's proposed amendment fails to state actionable claims against Chevron

for breach of contract, breach of warranty, negligence, and products liability, leave to amend those claims is denied. For those claims only, it is recommended that the Court grant Chevron's motion to dismiss.

## Background and Procedural History

In October of 2019, Chevron contracted with a shipping company, Blessey Marine Service, Inc.,[1] to transport oil from Pasadena, Texas on two hot oil barges. *See* Dkt. 18-1 ¶¶ 8-10. The type of oil that Chevron shipped is known as "Slurry Oil." *Id.* ¶ 9. According to Enjet's proposed amended complaint, Slurry Oil has a specific and unique chemical makeup. *See id.* ¶¶ 22-23. Typically, Slurry Oil contains only between two and ten parts per million ("ppm") of potassium. *Id.* ¶ 23. Yet Chevron's batch of Slurry Oil allegedly contained 1,200 to 2,300 ppm of potassium—hundreds of times more than its customary "maximum specification." *Id.* ¶ 37.

Nonetheless, Chevron had provided Blessey a certificate of analysis ("COA")—a document listing all constituent parts of Chevron's cargo. *Id.* ¶ 11. Chevron's COA did not list potassium at all. *Id.* ¶ 24.[2] Enjet alleges that some of Chevron's Slurry Oil—with its uncharacteristically high levels of

---

[1] Blessey, another defendant in this suit, has asserted a cross-claim against Chevron.

[2] Enjet mistakenly labeled its paragraph 24 as "14." The Court will refer to that paragraph with its proper numeration, ¶ 24.

potassium—remained in the tanks of Blessey's barges after the shipment was offloaded. *See id.* ¶ 30.

Blessey later contracted with Enjet to transport Enjet's oil, called Carbon Black Feedstock, to Birla Carbon U.S.A., Inc. using the same pair of barges. *Id.* ¶ 13. Before loading its cargo on Blessey's barges, Enjet reviewed the COA of the immediately preceding shipment—Chevron's COA—to ensure that any residual amounts remaining in the barges' tanks would not contaminate Enjet's shipment. *Id.* ¶¶ 15, 19-20, 27. Enjet saw that Chevron's COA listed Slurry Oil, which typically is compatible with Carbon Black Feedstock, and found no potassium disclosed on that COA. *Id.* ¶¶ 23, 26.

Relying on that information, Enjet proceeded to load its Carbon Black Feedstock on the Blessey barges. *Id.* ¶¶ 23, 26. But when the shipment arrived at Birla's facility, Birla tested the oil, found it contaminated with potassium, and refused to accept it. *Id.* ¶ 39. This lawsuit ensued. Dkt. 1.

## Standard of Review

Generally, leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). "The trial court acts within its discretion in denying leave to amend where the proposed amendment would be futile because it could not survive a motion to dismiss." *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010).

To survive dismissal under Rule 12(b)(6), a party must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## Analysis

### I. Rule 15(a) governs Enjet's request for leave to amend.

Chevron mounts a flawed procedural challenge to Enjet's proposed amendment. It claims that permitting the new pleading is unjustified because the pleading fails to "set[ ] out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." *See* Dkt. 22 at 2 (quoting Fed. R. Civ. P. 15(d)). That is the wrong standard.

Enjet styled its new complaint as "Plaintiff Enjet, LLC's Supplemental, Amended, and Restated Complaint." Dkt. 18-1. But its proposed pleading, in substance, seeks to *amend* its original complaint by providing additional factual detail—not supplement that pleading with allegations or claims involving post-suit events.

Rather, Enjet's request for leave to amend is governed by Rule 15(a)(2), under which "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The relevant factors include "[(1)] whether permitting

4

the pleading would cause undue delay in the proceedings or undue prejudice to the nonmovant, [(2)] the movant is acting in bad faith or with a dilatory motive, [(3)] the movant has previously failed to cure deficiencies by prior pleadings, or [(4)] the proposed pleading is futile in that it adds nothing of substance to the original allegations or is not germane to the original cause of action. *Lewis v. Knutson*, 699 F.2d 230, 239 (5th Cir. 1983).

Chevron has neither asserted nor demonstrated that Enjet's proposed amendment would cause undue delay or prejudice, that Enjet is acting in bad faith, or that Enjet's prior pleadings failed to cure deficiencies. Instead, Chevron's relies solely relies on its contention that amendment would be futile, Dkt. 22 at 3-17, a contention addressed below in Parts II-VI *infra*.

## II. Enjet has withdrawn its breach of contract and breach of warranty claims against Chevron.

In its original complaint, Enjet asserted claims against Chevron for breach of contract and breach of the warranty of workmanlike performance. *See* Dkt. 1 ¶ 26. Enjet now concedes that those causes of action are unavailable, and it has agreed to dismiss those claims with prejudice. *See* Dkt. 18 at 3. It is therefore recommended that those claims be dismissed.

### III. Enjet's amended complaint fails to state a claim for strict products liability.

As for Enjet's products liability cause of action, Chevron argues that amending this claim would be futile because Enjet lacks standing to assert it. *See* Dkt. 22 at 11-12. The Court agrees.

Under maritime law, products liability claims are governed by the Restatement (Second) of Torts § 402A (1965). *See Ortega Garcia v. United States*, 986 F.3d 513, 532 (5th Cir. 2021). To prevail, Enjet must show that (1) Chevron sold a product to a user or consumer of the property, (2) Chevron's product was unreasonably dangerous or defective when it left Chevron's control, (3) the defects caused injury to the ultimate user or consumer, or to their property, and (4) damages. *Ortega Garcia*, 986 F.3d at 533 (citing *Vickers v. Chiles Drilling Co.*, 822 F.2d 535, 538-40 (5th Cir. 1987)).

Critically, Enjet must be able to show that it was the "'ultimate user or consumer' who is harmed by [the] allegedly defective product ...." *Id.* at 531. There is no allegation that Enjet was an ultimate user or consumer of Chevron's Slurry Oil. *Cf.* Dkt. 18-1 ¶ 47. Enjet simply alleges that residual Slurry Oil in Blessey's barges was incompatible with Enjet's own product. Because Enjet's lack of consumer status forecloses its strict products liability theory, allowing Enjet to amend it would be futile. *Rio Grande Royalty Co.*, 620 F.3d at 468. This claim should be dismissed.

6

**IV.   Enjet's amended complaint plausibly states a claim for negligent misrepresentation under Section 552 of the Restatement.**

Chevron's challenges to Enjet's negligent misrepresentation claim attack the elements of recovery, as well as the additional requirement that Enjet demonstrate its membership in a limited class of persons permitted to assert the claim. *See* Dkt. 22 at 4-11. The Court first addresses Enjet's entitlement to sue before examining the elements of this claim.

**A.   Enjet falls within the class of persons who can bring a negligent misrepresentation claim based on Chevron's COA.**

Section 552 of the Restatement (Second) of Torts governs negligent misrepresentation claims in the maritime context. *See Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.*, 346 F.3d 530, 535 (5th Cir. 2003). It provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 (1977).

To assert this claim, a plaintiff must belong to a specific class of people who could be expected to rely on the allegedly false information that a defendant supplied. Courts have drawn the boundaries differently, from liberally permitting all foreseeable users of the information to sue, to requiring

7

that a defendant know that information will reach someone in the plaintiff's group, to demanding—most strictly—that a plaintiff have near-contractual privity with the defendant. *Compare Petrillo v. Bachenberg*, 655 A.2d 1354, 1360 (N.J. 1995) (espousing the "foreseeability" rule), *with First Nat'l Bank of Commerce v. Monco Agency, Inc.*, 911 F.2d 1053, 1059-60 (5th Cir. 1990) (adopting the Restatement's "actual knowledge" rule and opining that Louisiana law would follow that approach), *and Ultramares Corp. v. Touche, Niven & Co.*, 174 N.E. 441, 447-48 (1931) (Cardozo, J.) (establishing the New York "near privity rule").

The Fifth Circuit has embraced the Restatement's middle-ground approach. *See First Nat'l Bank*, 911 F.2d at 1059-60. Mere foreseeability of a plaintiff's reliance is not enough, but the defendant need not know the plaintiff's precise identity either. *See id.* (noting that "the Restatement contemplates identification of a narrow group, not necessarily the specific membership within that group," yet "not every reasonably foreseeable [user of the] information may recover"). The Fifth Circuit applied that principle to an accountant's liability to third parties:

> The Restatement expressly limits liability to a select group of nonclients who the misinformer actually knows will receive inaccurate information principally because the misinformer knows that the client will channel the work product to that restricted group. Additionally, the misinformer must know that its client intends to use the inaccurate information to influence a particular

8

> business transaction, or a "substantially similar transaction," to follow.

*Id.* at 1061. In doing so, the Fifth Circuit acknowledged that "section 552 may extend liability to an unnamed group of informational consumers ...." *Id.*

The Restatement's approach forecloses Chevron's arguments against Enjet's entitlement to sue. In Chevron's view, Enjet must allege and ultimately prove that Chevron knew (or intended) that Enjet, *in particular*, would receive the COA. Dkt. 22 at 4-6. Chevron also insists that it had to know both the specifics of Enjet's transaction with Birla (*i.e.*, the contract itself and Birla's specifications for its Carbon Black Feedstock), and that Blessey would provide the COA to Enjet specifically. *Id.* at 5.

Chevron's position cannot be squared with *First National* or the Restatement. A supplier of information need not know the exact identity of the third-party who will rely on the information. *First Nat'l Bank*, 911 F.2d at 1061; Restatement (Second) of Torts § 552, cmt. h ("[I]t is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied."). And when that information is provided to a contracting party, it is enough that the provider knows that the other party intends to use the information to influence either a specific business transaction or a substantially similar one. *See First Nat'l Bank*, 911 F.2d at 1061; Restatement (Second) of Torts § 552, cmt. h ("It is

9

enough ... that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group.").

Enjet's proposed pleading clears these hurdles. It alleges that Chevron knew and intended that carriers like Blessey—to whom Chevron directly provided the COA—and Blessey's subsequent shippers and charterers like Enjet—to whom the COA would subsequently be provided—would use and rely on Chevron's COA to ensure their cargo is compatible with what Chevron previously shipped. *See* Dkt. 18-1 ¶¶ 16, 17. Enjet has adequately pleaded Chevron's knowledge and intent at this stage.

Enjet's definition of the class of persons entitled to sue raises another limitation. On its face, Enjet's proposed "class" includes *all* "subsequent shippers and charterers" who contracted to use Blessey's barges. *See* Dkt. 18-1 ¶ 19. Framing the class that broadly risks exposing Chevron to the type of unbounded liability that the Restatement seeks to prevent. *Cf. Otto Candies*, 346 F.3d at 535 (cautioning that negligent misrepresentation claims against maritime classification societies must be "strictly and carefully limited").

Yet Enjet's allegations reasonably support its membership in a narrower class than all entities that may later use or charter the same Blessey barges. After all, Enjet's proposed pleading notes that the COA's purpose is to inform the *very next* shipper or charterer about the contents of the *immediately* preceding cargo—as opposed to an entity seeking to contract for the barges' use

many shipments later. *See* Dkt. 18-1 ¶ 17 (alleging Chevron's knowledge and intent that shippers and charterers would rely on its COA "to ensure that the *last* cargo was compatible with *next* cargo") (emphasis added); *see also* Dkt. 23 at 3 (arguing that COA's purpose is to ensure that the residual of the last cargo is compatible with the next cargo). Thus circumscribed, Enjet has alleged its membership in a limited class of persons authorized to sue for negligent misrepresentations in Chevron's COA.

### B. Enjet's amended allegations meet the remaining requirements for negligent misrepresentation.

For the remaining requirements, the Fifth Circuit has distilled Section 552 into four elements: that (1) the defendant, in the course of its profession, supplied false information for the guidance of others in a business transaction; (2) the defendant failed to exercise reasonable care in gathering or communicating the information; (3) the plaintiff justifiably relied on the false information in a transaction that defendant intended to influence or that the defendant knew that the recipient of the information would intend to influence; and (4) the plaintiff thereby suffered pecuniary loss. *See Otto Candies, L.L.C.*, 346 F.3d at 535. Contrary to Chevron's contentions, these elements are adequately pleaded in Enjet's proposed amended complaint.[3]

---

[3] To the extent that Chevron challenges Enjet's pleading of damages (the fourth element), those contentions overlap with its broader argument that the economic loss rule bars all of Enjet's claims. Dkt. 22 at 15-17; Dkt. 24 at 14-15. As concluded in

      1.    <u>Enjet sufficiently alleges that Chevron provided false information for the guidance of others in their business transactions.</u>

Regarding the first element, Chevron argues that its COA did not provide false information "for Enjet's guidance in a business transaction." Dkt. 22 at 6. According to Chevron, Enjet had to allege that Chevron knew of Enjet's business dealings, specifically. *See* Dkt. 22 at 8. Chevron also appears dispute whether the statements in its COA were false. *See* Dkt. 22 at 6-7 ("However, Enjet fails to provide any relevant authority to support its bald assertion that there is a maximum level of potassium for what can be deemed slurry oil and that slurry oil typically has a potassium content level of 2ppm"). Neither contention is persuasive.

Section 552 does not require that Chevron have actual knowledge of Enjet's identity. *See First Nat'l Bank*, 911 F.2d at 1059. Under this element, it is enough that Chevron provided its COA to another party while knowing that the party "intends to transmit the information" to members of a particular group. Restatement (Second) of Torts § 552, cmt. h. That is what Enjet plausibly alleges in its amended complaint. *See* Dkt. 18-1 ¶¶ 11, 17.

---

Part VI, *infra*, Enjet's allegations overcome that hurdle. And Enjet has sufficiently alleged monetary losses associated with the costs of removing and treating the contaminated oil. *See* Dkt. 18-1 ¶¶ 39-44.

Chevron's further contention that the COA did not supply "false" information by omitting potassium content is also meritless. Although not explicitly addressed in the Restatement, courts have concluded that material omissions can support a negligent misrepresentation claim, at least when the information withheld makes other affirmative statements misleading. *See, e.g.*, *Lorona v. Ariz. Summit L. Sch., LLC*, 188 F. Supp. 3d 927, 931, 935 (D. Ariz. 2016) (denying motion to dismiss fraud and interrelated negligent misrepresentation claims where law school's disclosure of enrollment statistics omitted LSAT scores and GPAs for students admitted through an alternative program); *Petrillo*, 655 A.2d at 1355, 1360, 1362 (concluding there were fact issues precluding resolution of negligent misrepresentation claim when the attorney disclosed reports reflecting that property passed two of seven percolation tests, but other undisclosed reports showed the property had passed only two of thirty tests). This approach comports with settled law for fraud claims, where actionable false statements include partial disclosures that create a misleading impression. *See, e.g.*, *Trs. of Nw. Laundry & Dry Cleaners Health & Welfare*, 27 F.3d 153, 157 (5th Cir. 1994) ("A speaker who makes a partial disclosure assumes a duty to tell the whole truth even when the speaker was under no duty to make the partial disclosure.").

Enjet's allegations fit this mold. The amended complaint asserts that the standard specifications for Slurry Oil include only a nominal amount of

13

potassium, which is why COAs ordinarily do not disclose potassium. Dkt. 18-1 ¶¶ 23-25. Yet Chevron's Slurry Oil contained high amounts of potassium—a fact that Chevron's COA did not disclose. *Id.* ¶¶ 25-26, 37. The omission of potassium levels therefore indicates that Chevron's COA was misleading, particularly when the COA discloses measurements of numerous other components. *See* Dkt. 18-1, Ex. 1 (listing, *inter alia*, amount of sulfur, aluminum, silicon, ash, nitrogen, hydrogen sulfide, and potential total sediment). Enjet has plausibly alleged an actionable false representation.

> 2. <u>Enjet sufficiently alleged that Chevron failed to exercise reasonable care in gathering or communicating the information.</u>

Next, Chevron insists that it had no obligation to exercise reasonable care when gathering information about its Slurry Oil (*i.e.*, by testing it). Dkt. 22 at 8-9; Dkt. 24 at 7. Enjet responds that it need only allege that Chevron breached a duty of care by issuing a COA that misleadingly failed to disclose the Oil's potassium content. *See* Dkt. 18 at 5; Dkt. 23 at 3. Enjet is correct.

The amended complaint alleges that Slurry Oil, as understood in the industry, does not contain appreciable amounts of potassium. Dkt. 18-1 ¶¶ 23-25. But Chevron's Slurry Oil did contain potassium, and in large amounts. Yet according to the allegations, Chevron's COA negligently described its cargo as "Slurry Oil" without disclosing the oil's high potassium content—all while

14

disclosing other components. *See* Dkt. 18-1 ¶ 46. These allegations are sufficient to survive dismissal and to justify leave to amend.

### 3. Enjet has alleged its justifiable reliance on the false information.

For the following element, Chevron argues that Enjet failed to allege any actual and justifiable reliance on Chevron's COA. Chevron maintains that the Restatement requires it to have *intended* that Enjet rely on its representations. Dkt. 22 at 9-10. But a defendant's intent to induce reliance is just one of two alternative ways to establish justifiable reliance. *See* Restatement (Second) of Torts § 552(2). The alternative theory permits recovery if a defendant "knows that the recipient" of the information will use the information to influence a transaction with someone in the plaintiff's group. *Id.* § 552(2)(b).

Regardless, Enjet's pleading invokes both alternatives. Enjet alleges that "Chevron possessed at all relevant times the *knowledge and the intent* that its certificates of analysis would be used by carriers, such as Blessey, *and subsequent shippers and charterers*, such as Enjet, that would rely upon such certificates of analysis to ensure that the last cargo was compatible with next cargo." Dkt. 18-1 ¶ 17 (emphasis added). Enjet also alleges that it actually and justifiably relied on Chevron's COA when deciding whether to load its Carbon Black Feedstock onto Blessey's barges, and that it would have not used

15

those barges had it known of the higher potassium concentration. *Id.* ¶¶ 27, 28. These assertions plausibly allege justifiable reliance.

In sum, Enjet's proposed amended complaint states a cognizable negligent misrepresentation claim. The Court grants leave to amend this claim and recommends denying Chevron's request to dismiss it.

## V. **The amended complaint fails to state a claim for general maritime negligence.**

For Enjet's negligence claim, Chevron disputes that it owes Enjet any general duty of care. Dkt. 22 at 13-15. In response, Enjet couches that duty solely as an obligation to refrain from making *negligent misrepresentations*—not just to Enjet, but to the "slurry oil and carbon black feedstock market" at large. *See* Dkt. 23 at 4. Enjet's assertion exposes that whatever claimed duty of care exists is subsumed by its negligent misrepresentation claim. *See, e.g., United States v. Neustadt*, 366 U.S. 696, 706-08 (1961) (explaining, under the Federal Tort Claims Act, that "[t]o say ... that a claim arises out of 'negligence,' rather than 'misrepresentation,' when the loss suffered by the injured party is caused by the breach of a 'specific duty' ... *i.e.*, the duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs, is only to state the traditional and commonly understood legal definition of the tort of 'negligent misrepresentation'").

16

Endorsing Enjet's negligence theory would permit an end run around the strictures of Section 552 of the Restatement. As Enjet's contention illustrates, Chevron's scope of liability for general negligence could encompass all *foreseeable* parties in the entire "slurry oil and carbon black feedstock market." Dkt. 23 at 4. But Section 552 limits the universe of potential plaintiffs to just those immediate shippers or charters to whom Chevron intended or knew that the COA would be provided. *See supra* Part IV.B.1. There is no basis for allowing Enjet to expand Chevron's duty of care by recasting its negligent misrepresentation claim as general negligence. Because the negligent claim is futile, it should be dismissed without leave to amend.

## VI. This suit is not barred by the economic loss rule.

Finally, Chevron asserts that all of Enjet's claims—including for negligent misrepresentation—are barred by the economic loss rule. Dkt. 22 at 15-17; Dkt. 24 at 14-15. The economic loss rule prescribes that "physical damage to a proprietary interest [is] a prerequisite to recovery for economic loss in cases of unintentional maritime tort." *State of La. ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1020 (5th Cir. 1985) (en banc); *see also Taira Lynn Marie Ltd. No. 5, LLC v. Jays Seafood, Inc.*, 444 F.3d 371, 377 (5th Cir. 2006) (same principle). Thus, a plaintiff's lack of proprietary interest in the damaged property precludes tort recovery. *See In re Deepwater Horizon*, 784 F.3d 1019,

1030-31 (5th Cir. 2015) (affirming dismissal of tort claims by three Mexican States that lacked a proprietary interest in the damaged land and resources).

Invoking the proprietary-interest requirement, Chevron maintains that Enjet's negligent misrepresentation claim fails because the allegation that it "owned" the Carbon Black Feedstock—in the past tense—indicates that Enjet relinquished ownership at some point. Dkt. 22 at 16 (citing Dkt. 18-1 ¶ 32). This contention ignores other allegations supporting a reasonable inference that Enjet owned the oil when it was contaminated. *See* Dkt. 18-1 ¶¶ 39 (alleging that Birla refused to accept the out of specification oil), 41-42 (alleging that Enjet performed the labor and incurred the cost of removing the oil from Birla's facility), 43 (alleging that the contaminated oil was brought back to Enjet's facility), 44 (alleging that Enjet incurred nearly $700,000 in damages). At this stage, Enjet's proposed pleading sufficiently asserts physical damage to a proprietary interest. The economic loss rule does not require dismissal.

### Recommendation

Enjet's proposed complaint alleges a claim for negligent misrepresentation that can survive dismissal, but the remainder of its claims do not. For the reasons stated herein, it is **ORDERED** that Enjet's motion for leave to amend its complaint (Dkt. 18) is **GRANTED IN PART** and **DENIED IN PART**. Enjet's request to amend its complaint to assert a negligent misrepresentation claim is granted, but leave to amend its claims for general

negligence and products liability is denied. It is further **RECOMMENDED** that Chevron's motion to dismiss Enjet's claims (Dkt. 13) be **GRANTED IN PART** and **DENIED IN PART**. Enjet's claims for breach of contract, breach of warranty, general negligence, and products liability should be dismissed. Dismissal of Enjet's proposed negligent misrepresentation claim should be denied.

**The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.** *Ortiz v. City of San Antonio Fire Dep't*, **806 F.3d 822, 825 (5th Cir. 2015).**

Signed on August 8, 2022, at Houston, Texas.

_____
Yvonne Y. Ho
United States Magistrate Judge